UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO. _____

UNITED STATES OF AMERICA

v.

TEVA PHARMACEUTICAL
INDUSTRIES LTD.,

Defendant.

_____/

## DEFERRED PROSECUTION AGREEMENT

Defendant TEVA PHARMACEUTICAL INDUSTRIES LTD. (the "Company"),

pursuant to authority granted by the Company's Board of Directors, and the United States

Department of Justice, Criminal Division, Fraud Section (the "Fraud Section"), enter into this

deferred prosecution agreement (the "Agreement").

### Criminal Information and Acceptance of Responsibility

1.     The Company acknowledges and agrees that the Fraud Section will file the

attached two-count criminal Information in the United States District Court for the Southern

District of Florida charging the Company with one count of conspiracy to violate the Foreign

Corrupt Practices Act of 1977 ("FCPA"), as amended, Title 15, United States Code, Section

78dd-1, in violation of Title 18, United States Code, Section 371; and one count of violating the

FCPA, contrary to Title 15, United States Code, Sections 78m(b)(2)(B), 78m(b)(5), and 78ff(a).

In so doing, the Company: (a) knowingly waives its right to indictment on these charges, as well

as all rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution,

1

Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b); and

(b) knowingly waives any objection with respect to venue to any charges by the United States

arising out of the conduct described in the Statement of Facts attached hereto as Attachment A

(the "Statement of Facts") and consents to the filing of the Information, as provided under the

terms of this Agreement, in the United States District Court for the Southern District of Florida.

The Fraud Section agrees to defer prosecution of the Company pursuant to the terms and

conditions described below.

2.      The Company admits, accepts, and acknowledges that it is responsible under

United States law for the acts of its former officers, directors, employees, and agents as charged

in the Information, and as set forth in the Statement of Facts, and that the allegations described in

the Information and the facts described in the attached Statement of Facts are true and accurate.

Should the Fraud Section pursue the prosecution that is deferred by this Agreement, the

Company stipulates to the admissibility of the Statement of Facts in any proceeding by the Fraud

Section, including any trial, guilty plea, or sentencing proceeding, and will not contradict

anything in the attached Statement of Facts at any such proceeding.

**Term of the Agreement**

3.      This Agreement is effective for a period beginning on the date on which the

Information is filed and ending three years from the later of the date on which the Information is

filed or the date on which the independent compliance monitor (the "Monitor") is retained by the

Company, as described in Paragraphs 11-13 below (the "Term"). The Company agrees,

however, that, in the event the Fraud Section determines, in its sole discretion, that the Company

has knowingly violated any provision of this Agreement, an extension or extensions of the Term

may be imposed by the Fraud Section, in its sole discretion, for up to a total additional time

period of one year, without prejudice to the Fraud Section's right to proceed as provided in

Paragraphs 16-20 below.  Any extension of the Agreement extends all terms of this Agreement,

including the terms of the monitorship in Attachment D, for an equivalent period.  Conversely, in

the event the Fraud Section finds, in its sole discretion, that there exists a change in

circumstances sufficient to eliminate the need for the monitorship in Attachment D, and that the

other provisions of this Agreement have been satisfied, the Agreement may be terminated early.

If the Court rejects the Agreement, all the provisions of the Agreement shall be deemed null and

void, and the Term shall be deemed to have not begun.

### Relevant Considerations

4.       The Fraud Section enters into this Agreement based on the individual facts and

circumstances presented by this case, including:

a.       The Company did not timely voluntarily self-disclose the FCPA violations

to the Fraud Section, and as a result the Company was not eligible for a more significant discount

on the fine amount or the form of resolution;

b.       The Company received credit for its cooperation with the Fraud Section's

investigation, including voluntarily making U.S. and foreign employees available for interviews;

at the request of the government in certain limited circumstances, deferring personnel actions in

order to allow U.S. and foreign employees to be available for interviews, and deferring witness

interviews to de-conflict with the Fraud Section's investigation; collecting, analyzing, translating

and organizing voluminous evidence from multiple jurisdictions; providing updates to the Fraud

Section as to the conduct and results of the Company's internal investigation; providing all non-

privileged facts relating to individual involvement in the conduct described in the Statement of

Facts and conduct disclosed to the Fraud Section prior to the Agreement; and disclosing to the

3

Fraud Section conduct in Russia and Ukraine of which the Fraud Section was previously unaware.  The Company did not receive full credit because of issues that resulted in delays to the early stages of the investigation, including vastly overbroad assertions of attorney-client privilege and not producing documents on a timely basis in response to certain Fraud Section document requests;

c.      The Company engaged in remediation measures, including:  (1) causing at least 15 employees who were involved in the misconduct described in the Statement of the Facts to be removed from the Company, because their employment was terminated, they resigned after being asked to leave, or they voluntarily left once the Company's internal investigation began; (2) enhancing the Company's compliance function by implementing a number of policies and procedures designed to prevent prohibited conduct, including the establishment of a system to monitor transactions with members of the health care community; (3) adopting an improved anti-corruption training program; (4) adopting a standalone third-party due diligence program and terminating business relationships with certain third parties; (5) enhancing the independence of the Company's control functions and establishing an office charged with addressing reports of misconduct; and (6) establishing a dedicated Global Compliance Audit group and strengthening the Company's internal audit and investigations teams;

d.      The Company has enhanced and is committed to continuing to enhance its compliance program and internal controls, including ensuring that it satisfies the elements of the corporate compliance program set forth in Attachment C to this Agreement;

e.      Although the Company has engaged in remedial efforts, many of the Company's compliance program enhancements are more recent and have accordingly not been

4

tested. Thus the Company has agreed to the imposition of an independent compliance monitor to diminish the risk of reoccurrence of the misconduct;

        f.      Accordingly, after considering (a) through (e) above, the Company received an aggregate discount of 20% off of the bottom of the Sentencing Guidelines fine range;

        g.      The nature and seriousness of the offense, including the high-dollar amount of illegal payments to foreign officials, conduct in multiple, high-risk jurisdictions, the pervasiveness throughout the Company's business units responsible for the operations in the countries at issue, and the involvement of high-level executives in the criminal conduct described in the Statement of Facts;

        h.      The Company has agreed to continue to cooperate with the Fraud Section in any investigation relating to violations of the FCPA as described in Paragraph 5 below.

<u>**Future Cooperation and Disclosure Requirements**</u>

    5.      The Company shall cooperate fully with the Fraud Section in any and all matters relating to the conduct described in this Agreement and the Statement of Facts, and any individual or entity referred to therein, as well as other conduct related to corrupt payments, false books, records, and accounts, or the failure to implement adequate internal accounting controls, subject to applicable law and regulations, until the later of the date upon which all investigations and prosecutions arising out of such conduct are concluded, or the end of the term specified in paragraph 3. At the request of the Fraud Section, the Company shall also cooperate fully with other domestic or foreign law enforcement and regulatory authorities and agencies, as well as the Multilateral Development Banks ("MDBs"), in any investigation of the Company, its parent company or its affiliates, or any of its present or former officers, directors, employees, agents, and consultants, or any other party, in any and all matters relating to corrupt payments, false

books, records, and accounts, or the failure to implement adequate internal accounting controls. The Company agrees that its cooperation pursuant to this paragraph, the scope of which is set forth above, shall include, but not be limited to, the following, subject to local law and regulations, including relevant data privacy and national security laws and regulations:

      a.    The Company shall truthfully disclose all factual information not protected by a valid claim of attorney-client privilege or work product doctrine with respect to its activities, those of its affiliates, and those of its present and former directors, officers, employees, agents, and consultants, including any evidence or allegations and internal or external investigations, about which the Company has any knowledge or about which the Fraud Section may inquire. This obligation of truthful disclosure includes, but is not limited to, the obligation of the Company to provide to the Fraud Section, upon request, any document, record or other tangible evidence about which the Fraud Section may inquire of the Company.

      b.    Upon request of the Fraud Section, the Company shall designate knowledgeable employees, agents or attorneys to provide to the Fraud Section the information and materials described in Paragraph 5(a) above on behalf of the Company. It is further understood that the Company must at all times provide complete, truthful, and accurate information.

      c.    The Company shall use its best efforts to make available for interviews or testimony, as requested by the Fraud Section, present or former officers, directors, employees, agents and consultants of the Company. This obligation includes, but is not limited to, sworn testimony before a federal grand jury or in federal trials, as well as interviews with domestic or foreign law enforcement and regulatory authorities. Cooperation under this Paragraph shall

include identification of witnesses who, to the knowledge of the Company, may have material information regarding the matters under investigation.

        d.      With respect to any information, testimony, documents, records or other tangible evidence provided to the Fraud Section pursuant to this Agreement, the Company consents to any and all disclosures, subject to applicable law and regulations, to other governmental authorities, including United States authorities and those of a foreign government, as well as the MDBs, of such materials as the Fraud Section, in its sole discretion, shall deem appropriate.

      6.     In addition to the obligations in Paragraph 5, during the Term, should the Company learn of any evidence or allegations of conduct that would be a possible violation of the FCPA anti-bribery or accounting provisions had the conduct occurred within the jurisdiction of the United States, the Company shall promptly report such evidence or allegations to the Fraud Section.

<b><u>Payment of Monetary Penalty</u></b>

      7.     The Fraud Section and the Company agree that application of the United States Sentencing Guidelines ("USSG" or "Sentencing Guidelines") to determine the applicable fine range yields the following analysis:

        a.      The 2015 USSG are applicable to this matter.

        b.      <u>Multiple Counts</u>. Under USSG §§ 3D1.2(b) and 3D1.3(a), the counts are grouped and the most serious of the counts comprising the group, i.e., the highest offense level of the counts in the group, is the applicable offense level.

        c.      <u>Offense Level</u>. Based upon USSG § 2C1.1, the total offense level is 44, calculated as follows:

           (a)(2)  Base Offense Level              12

7

|  | (b)(1) | Multiple Bribes | +2 |
|---|---|---|---|
|  | (b)(2) | Value of benefit received more than $150,000,000 | +26 |
|  | (b)(3) | High-level Official Involved | +4 |
|  | **TOTAL** | | 44 |

d.   Base Fine. Based upon USSG § 8C2.4(a)(2), the base fine is $221,232,303 (as the pecuniary gain exceeds the fine in the Offense Level Fine Table, namely $72,500,000)

e.   Culpability Score. Based upon USSG § 8C2.5, the culpability score is 8, calculated as follows:

| (a) | Base Culpability Score | 5 |
|---|---|---|
| (b)(1) | the organization had 5,000 or more employees and an individual within high-level personnel of the organization participated in, condoned, or was willfully ignorant of the offense | +5 |
| (g)(2) | The organization fully cooperated in the investigation and clearly demonstrated recognition and affirmative acceptance of responsibility for its criminal conduct | - 2 |
| **TOTAL** | | 8 |

Calculation of Fine Range:

| Base Fine | $221,232,303 |
|---|---|
| Multipliers | 1.6 (min) / 3.2 (max) |
| Fine Range | $353,971,685 / $707,943,370 |

The Company and the Fraud Section agree that the appropriate resolution in this case is a criminal penalty of $283,177,348, and disgorgement of the Company's profits in the amount of $214,596,170, plus prejudgment interest on the disgorgement of $21,505,654. The Company, directly or through an affiliate, agrees to transfer the monetary penalty of $283,177,348 into an

escrow account within ten (10) days of the execution of this agreement for the benefit of the United States Treasury. The monetary penalty in the amount of $283,177,348 shall be released from the escrow account to the United States Treasury within ten (10) days of the entry of the judgment against Teva Russia, in connection with its guilty plea, pursuant to a plea agreement, in the United States District Court for the Southern District of Florida filed simultaneously herewith. The parties agree that any criminal fine that might be imposed by the Court against Teva LLC, in connection with its guilty plea and plea agreement, will be paid from the $283,177,348 monetary penalty held in the escrow account and that any remaining balance will be transferred from the escrow account within ten (10) days of entry of the judgment to the United States Treasury. The Fraud Section further agrees to credit the $236,101,824 disgorgement and prejudgment interest paid by the Company in connection with its settlement of this matter with the U.S. Securities and Exchange Commission. The Company and the Fraud Section agree that this penalty is appropriate given the facts and circumstances of this case, including the factors described in Paragraph 4 above. The $283,177,348 penalty is final and shall not be refunded. Furthermore, nothing in this Agreement shall be deemed an agreement by the Fraud Section that $283,177,348 is the maximum penalty that may be imposed in any future prosecution, and the Fraud Section is not precluded from arguing in any future prosecution that the Court should impose a higher fine, although the Fraud Section agrees that under those circumstances, it will recommend to the Court that any amount paid under this Agreement should be offset against any fine the Court imposes as part of a future judgment. The Company acknowledges that no tax deduction may be sought in connection with the payment of any part of this $283,177,348 penalty. The Company shall not seek or accept directly or indirectly reimbursement or indemnification from any source with regard to the penalty or disgorgement

amounts that the Company pays pursuant to this Agreement or any other agreement entered into with an enforcement authority or regulator concerning the facts set forth in the Statement of Facts.

### Conditional Release from Liability

8.      Subject to Paragraphs 16-20, below, the Fraud Section agrees, except as provided in this Agreement and in the plea agreement between the Fraud Section and Teva LLC (Russia) dated December 22, 2016, that it will not bring any criminal or civil case against the Company or any of its direct or indirect affiliates, subsidiaries, or joint ventures or any predecessor, successor or assign thereof, relating to any of the conduct described in this Agreement, the Statement of Facts, the criminal Information filed pursuant to this Agreement.  The Fraud Section, however, may use any information related to the conduct described in the Statement of Facts against the Company:  (a) in a prosecution for perjury or obstruction of justice; (b) in a prosecution for making a false statement; (c) in a prosecution or other proceeding relating to any crime of violence; or (d) in a prosecution or other proceeding relating to a violation of any provision of Title 26 of the United States Code.

a.      This Agreement does not provide any protection against prosecution for any future conduct by the Company.

b.      In addition, this Agreement does not provide any protection against prosecution of any individuals, regardless of their affiliation with the Company.

### Corporate Compliance Program

9.      The Company represents that it has implemented and will continue to implement a compliance and ethics program throughout its operations, including those of its affiliates, agents, and joint ventures, and those of its contractors and subcontractors whose responsibilities

10

include interacting with foreign officials or other activities carrying a high risk of corruption, designed to prevent and detect violations of the FCPA and other applicable anti-corruption laws.

10.     In order to address any deficiencies in its internal accounting controls, policies, and procedures, the Company represents that it has undertaken, and will continue to undertake in the future, in a manner consistent with all of its obligations under this Agreement, a review of its existing internal accounting controls, policies, and procedures regarding compliance with the FCPA and other applicable anti-corruption laws.  Where necessary and appropriate, the Company will adopt new or modify existing internal controls, policies, and procedures in order to ensure that the Company maintains: (a) an effective system of internal accounting controls designed to ensure the making and keeping of fair and accurate books, records, and accounts; and (b) a rigorous anti-corruption compliance program that incorporates relevant internal accounting controls, as well as policies and procedures designed to effectively detect and deter violations of the FCPA and other applicable anti-corruption laws.  The compliance program, including the internal accounting controls system will include, but not be limited to, the minimum elements set forth in Attachment C.

### Independent Compliance Monitor

11.     Promptly after the Fraud Section's selection pursuant to Paragraph 12 below, the Company agrees to retain a Monitor for the term specified in Paragraph 13.  The Monitor's duties and authority, and the obligations of the Company with respect to the Monitor and the Fraud Section, are set forth in Attachment D, which is incorporated by reference into this Agreement.  No later than the date of execution of this Agreement, the Company will propose to the Fraud Section a pool of three qualified candidates to serve as the Monitor.  The parties will endeavor to complete the monitor selection process within sixty (60) days of the execution of

this agreement.  The Monitor candidates or their team members shall have, at a minimum, the following qualifications:

      a.      demonstrated expertise with respect to the FCPA and other applicable anti-corruption laws, including experience counseling on FCPA issues;

      b.      experience designing and/or reviewing corporate compliance policies, procedures and internal controls, including FCPA and anti-corruption policies, procedures and internal controls;

      c.      the ability to access and deploy resources as necessary to discharge the Monitor's duties as described in the Agreement; and

      d.      sufficient independence from the Company to ensure effective and impartial performance of the Monitor's duties as described in the Agreement.

12.      The Fraud Section retains the right, in its sole discretion, to choose the Monitor from among the candidates proposed by the Company, though the Company may express its preference(s) among the candidates.  If the Fraud Section determines, in its sole discretion, that any of the candidates are not, in fact, qualified to serve as the Monitor, or if the Fraud Section, in its sole discretion, is not satisfied with the candidates proposed, the Fraud Section reserves the right to request that the Company nominate additional candidates.  In the event the Fraud Section rejects all proposed Monitors, the Company shall propose an additional three candidates within twenty business days after receiving notice of the rejection.  This process shall continue until a Monitor acceptable to both parties is chosen.  The Fraud Section and the Company will use their best efforts to complete the selection process within sixty (60) calendar days of the execution of this Agreement.  If the Monitor resigns or is otherwise unable to fulfill his or her obligations as set out herein and in Attachment D, the Company shall within twenty business days recommend

a pool of three qualified Monitor candidates from which the Fraud Section will choose a replacement.

13.     The Monitor's term shall be three years from the date on which the Monitor is retained by the Company, subject to extension or early termination as described in Paragraph 3. The Monitor's powers, duties, and responsibilities, as well as additional circumstances that may support an extension of the Monitor's term, are set forth in Attachment D.  The Company agrees that it will not employ or be affiliated with the Monitor or the Monitor's firm for a period of not less than two years from the date on which the Monitor's term expires.  Nor will the Company discuss with the Monitor or the Monitor's firm the possibility of further employment or affiliation during the Monitor's term.

### Deferred Prosecution

14.     In consideration of the undertakings agreed to by the Company herein, the Fraud Section agrees that any prosecution of the Company for the conduct set forth in this Agreement, the Statement of Facts, the Information and for the conduct that the Company disclosed to the Fraud Section prior to the signing of this Agreement, be and hereby is deferred for the Term of this Agreement.

15.     The Fraud Section further agrees that if the Company fully complies with all of its obligations under this Agreement, the Fraud Section will not continue the criminal prosecution against the Company described in Paragraph 1 and, at the conclusion of the Term, this Agreement shall expire.  Within six months of the Agreement's expiration, the Fraud Section shall seek dismissal with prejudice of the criminal Information filed against the Company described in Paragraph 1, and agrees not to file charges in the future against the Company or any of its indirect affiliates, subsidiaries, or joint ventures, or any predecessor, successor or assign

13

thereof, based on the conduct described in this Agreement and Attachment A, the Information

filed pursuant to this Agreement, or for conduct that the Company disclosed to the Fraud Section

prior to the signing of this Agreement.

## Breach of the Agreement

16.     If, during the Term, the Company (a) commits any felony under U.S. federal law;

(b) provides in connection with this Agreement deliberately false, incomplete, or misleading

information, including in connection with its disclosure of information about individual

culpability; (c) fails to cooperate as set forth in Paragraphs 5 and 6 of this Agreement; (d) fails to

implement a compliance program as set forth in Paragraphs 9 and 10 of this Agreement and

Attachment C; (e) commits any acts that, had they occurred within the jurisdictional reach of the

FCPA, would be a violation of the FCPA; or (f) otherwise fails specifically to perform or to

fulfill completely each of the Company's obligations under the Agreement, regardless of whether

the Fraud Section becomes aware of such a breach after the Term is complete, the Company

shall thereafter be subject to prosecution for any federal criminal violation of which the Fraud

Section has knowledge, including, but not limited to, the charges in the Information described in

Paragraph 1, which may be pursued by the Fraud Section in the U.S. District Court for the

Southern District of Florida or any other appropriate venue.  Determination of whether the

Company has breached the Agreement and whether to pursue prosecution of the Company shall

be in the Fraud Section's sole discretion.  Any such prosecution may be premised on information

provided by the Company or its personnel.  Any such prosecution relating to the conduct

described in the Statement of Facts or relating to conduct known to the Fraud Section prior to the

date on which this Agreement was signed that is not time-barred by the applicable statute of

limitations on the date of the signing of this Agreement may be commenced against the

14

Company, notwithstanding the expiration of the statute of limitations, between the signing of this

Agreement and the expiration of the Term plus one year.  Thus, by signing this Agreement, the

Company agrees that the statute of limitations with respect to any such prosecution that is not

time-barred on the date of the signing of this Agreement shall be tolled for the Term plus one

year.  In addition, the Company agrees that the statute of limitations as to any violation of federal

law that occurs during the Term will be tolled from the date upon which the violation occurs

until the earlier of the date upon which the Fraud Section is made aware of the violation or the

duration of the Term plus five years, and that this period shall be excluded from any calculation

of time for purposes of the application of the statute of limitations.

17.     In the event the Fraud Section determines that the Company has breached this

Agreement, the Fraud Section agrees to provide the Company with written notice prior to

instituting any prosecution resulting from such breach.  Within thirty days of receipt of such

notice, the Company shall have the opportunity to respond to the Fraud Section in writing to

explain the nature and circumstances of the breach, as well as the actions the Company has taken

to address and remediate the situation, which the Fraud Section shall consider in determining

whether to pursue prosecution of the Company.

18.     In the event that the Fraud Section determines that the Company has breached

this Agreement: (a) all statements made by or on behalf of the Company to the Fraud Section or

to the Court, including the Statement of Facts, and any testimony given by the Company before a

grand jury, a court, or any tribunal, or at any legislative hearings, whether prior or subsequent to

this Agreement, and any leads derived from such statements or testimony, shall be admissible in

evidence in any and all criminal proceedings brought by the Fraud Section against the Company;

and (b) the Company shall not assert any claim under the United States Constitution, Rule 11(f)

of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule that any such statements or testimony made by or on behalf of the Company prior or subsequent to this Agreement, or any leads derived therefrom, should be suppressed or are otherwise inadmissible. The decision whether conduct or statements of any current director, officer or employee, or any person acting on behalf of, or at the direction of, the Company, will be imputed to the Company for the purpose of determining whether the Company has violated any provision of this Agreement shall be in the sole discretion of the Fraud Section.

19.    The Company acknowledges that the Fraud Section has made no representations, assurances, or promises concerning what sentence may be imposed by the Court if the Company breaches this Agreement and this matter proceeds to judgment. The Company further acknowledges that any such sentence is solely within the discretion of the Court and that nothing in this Agreement binds or restricts the Court in the exercise of such discretion.

20.    Thirty days after the expiration of the period of deferred prosecution specified in this Agreement, the Company, by the Chief Executive Officer of the Company and the Chief Financial Officer of the Company, will certify to the Fraud Section that the Company has met its disclosure obligations pursuant to Paragraph 6 of this Agreement. Each certification will be deemed a material statement and representation by the Company to the executive branch of the United States for purposes of 18 U.S.C. § 1001, and it will be deemed to have been made in the judicial district in which this Agreement is filed.

## Sale, Merger, or Other Change in Corporate Form of Company

21.    Except as may otherwise be agreed by the parties in connection with a particular transaction, the Company agrees that in the event that, during the Term of the Agreement, it undertakes any change in corporate form, including if it sells, merges, or transfers business

16

operations that are material to the Company's consolidated operations, or to the operations of

any subsidiaries or affiliates involved in the conduct described in the Statement of Facts, as they

exist as of the date of this Agreement, whether such sale is structured as a sale, asset sale,

merger, transfer, or other change in corporate form, it shall include in any contract for sale,

merger, transfer, or other change in corporate form a provision binding the purchaser, or any

successor in interest thereto, to the obligations described in this Agreement.  The purchaser or

successor in interest must also agree in writing that the Fraud Section's ability to declare a

breach under this Agreement is applicable in full force to that entity.  The Company agrees that

the failure to include these provisions in the transaction will make any such transaction null and

void.  The Company shall provide notice to the Fraud Section at least thirty days prior to

undertaking any such sale, merger, transfer, or other change in corporate form. If the Fraud

Section notifies the Company prior to such transaction (or series of transactions) that it has

determined that the transaction(s) has the effect of circumventing or frustrating the enforcement

purposes of this Agreement, as determined in the sole discretion of the Fraud Section, the

Company agrees that such transaction(s) will not be consummated.  In addition, if at any time

during the term of the Agreement the Fraud Section determines in its sole discretion that the

Company has engaged in a transaction(s) that has the effect of circumventing or frustrating the

enforcement purposes of this Agreement, it may deem it a breach of this Agreement pursuant to

Paragraphs 16 through 19 of this Agreement.

### Public Statements by Company

22.     The Company expressly agrees that it shall not, through present or future

attorneys, officers, directors, employees, agents or any other person authorized to speak for the

Company make any public statement, in litigation or otherwise, contradicting the acceptance of

17

responsibility by the Company set forth above or the facts described in the Statement of Facts. Any such contradictory statement shall, subject to cure rights of the Company described below, constitute a breach of this Agreement, and the Company thereafter shall be subject to prosecution as set forth in Paragraphs 16 through 19 of this Agreement. The decision whether any public statement by any such person contradicting a fact contained in the attached Statement of Facts will be imputed to the Company for the purpose of determining whether it has breached this Agreement shall be at the sole discretion of the Fraud Section. If the Fraud Section determines that a public statement by any such person contradicts in whole or in part a statement contained in the Statement of Facts, the Fraud Section shall so notify the Company, and the Company may avoid a breach of this Agreement by publicly repudiating such statement(s) within five business days after notification. The Company shall be permitted to raise defenses and to assert affirmative claims in other proceedings relating to the matters set forth in the Statement of Facts provided that such defenses and claims do not contradict, in whole or in part, a statement contained in the Statement of Facts. This Paragraph does not apply to any statement made by any present or former officer, director, employee, or agent of the Company in the course of any local, state, U.S., or foreign criminal, regulatory, governmental or civil case initiated against such individual, unless such individual is speaking on behalf of the Company.

23.    The Company agrees that if it, or any of its direct or indirect subsidiaries or affiliates issues a press release or holds any press conference in connection with this Agreement, the Company shall first consult with the Fraud Section to determine (a) whether the text of the release or proposed statements at the press conference are true and accurate with respect to matters between the Fraud Section and the Company; and (b) whether the Fraud Section has any objection to the release.

24.     The Fraud Section agrees, if requested to do so, to bring to the attention of law enforcement and regulatory authorities the facts and circumstances relating to the nature of the conduct underlying this Agreement, including the nature and quality of the Company's cooperation and remediation.  By agreeing to provide this information to such authorities, the Fraud Section is not agreeing to advocate on behalf of the Company, but rather is agreeing to provide facts to be evaluated independently by such authorities.

### Limitations on Binding Effect of Agreement

25.     This Agreement is binding on the Company and the Fraud Section but specifically does not bind any other component of the Department of Justice, other federal agencies, or any state, local or foreign law enforcement or regulatory agencies, or any other authorities, although the Fraud Section will bring the cooperation of the Company and its compliance with its other obligations under this Agreement to the attention of such agencies and authorities if requested to do so by the Company.

### Notice

26.     Any notice to the Fraud Section under this Agreement shall be given by personal delivery, overnight delivery by a recognized delivery service, or registered or certified mail, addressed to Chief, FCPA Unit, Fraud Section, Criminal Division, U.S. Department of Justice, at 1400 New York Avenue N.W., Bond Building, Eleventh Floor, Washington, D.C. 20005.  Any notice to the Company under this Agreement shall be given by personal delivery, overnight delivery by a recognized delivery service, or registered or certified mail, addressed to Martin J. Weinstein, Esq., Willkie Farr & Gallagher LLP, 1875 K Street, N.W., Washington, D.C. 20006 and to Mark Filip, Esq., Kirkland & Ellis LLP, 300 North LaSalle, Chicago, Illinois 60654. Notice shall be effective upon actual receipt by the Fraud Section or the Company.

19

## Complete Agreement

27.    This Agreement, including its attachments, sets forth all the terms of the agreement between the Company and the Fraud Section.  No amendments, modifications or additions to this Agreement shall be valid unless they are in writing and signed by the Fraud Section, the attorneys for the Company and a duly authorized representative of the Company.

**AGREED:**

**FOR TEVA PHARMACEUTICAL INDUSTRIES LTD.:**

Date: 12/22/2016          By: _____
                               MARTIN J. WEINSTEIN
                               WILLKIE FARR & GALLAGHER LLP
                               ON BEHALF OF
                               TEVA PHARMACEUTICAL
                               INDUSTRIES LTD.


Date: _____     By: _____
                               MARK FILIP
                               KIRKLAND & ELLIS LLP
                               ON BEHALF OF
                               TEVA PHARMACEUTICAL
                               INDUSTRIES LTD.


**FOR THE DEPARTMENT OF JUSTICE:**

                               ANDREW WEISSMANN
                               Chief, Fraud Section
                               Criminal Division
                               United States Department of Justice


Date: _____     By: _____
                               ROHAN A. VIRGINKAR
                               JOHN-ALEX ROMANO
                               Trial Attorneys

20

**Complete Agreement**

27.     This Agreement, including its attachments, sets forth all the terms of the

agreement between the Company and the Fraud Section.  No amendments, modifications or

additions to this Agreement shall be valid unless they are in writing and signed by the Fraud

Section, the attorneys for the Company and a duly authorized representative of the Company.

**AGREED:**

**FOR TEVA PHARMACEUTICAL INDUSTRIES LTD.:**

Date: _____          By: _____

MARTIN J. WEINSTEIN
WILLKIE FARR & GALLAGHER LLP
ON BEHALF OF
TEVA PHARMACEUTICAL
INDUSTRIES LTD.

Date: 12/22/ 2016          By: _____

MARK FILIP
KIRKLAND & ELLIS LLP
ON BEHALF OF
TEVA PHARMACEUTICAL
INDUSTRIES LTD.

**FOR THE DEPARTMENT OF JUSTICE:**

ANDREW WEISSMANN
Chief, Fraud Section
Criminal Division
United States Department of Justice

Date: 12/22/2016          By: _____

ROHAN A. VIRGINKAR
JOHN-ALEX ROMANO
Trial Attorneys

20

## CERTIFICATE OF COUNSEL

The undersigned are outside counsel for Teva Pharmaceutical Industries Ltd. (the "Company") in the matter covered by this Agreement. In connection with such representation, the undersigned have examined relevant Company documents and have discussed the terms of this Agreement with the Company Board of Directors. Based on our review of the foregoing materials and discussions, we are of the opinion that the undersigned have been duly authorized by the Board of Directors of the Company to enter into this Agreement on behalf of the Company and that this Agreement has been duly and validly authorized, executed, and delivered on behalf of the Company and is a valid and binding obligation of the Company.

The undersigned have carefully reviewed the terms of this Agreement with the Board of Directors of the Company and have fully advised the Board of Directors of the rights of the Company, including of possible defenses, of the Sentencing Guidelines' provisions and of the consequences of entering into this Agreement. To our knowledge, the decision of the Company to enter into this Agreement, based on the authorization of the Board of Directors, is an informed and voluntary one.

Date: 12/22/2016

By: _____
    MARTIN J. WEINSTEIN
    WILLKIE FARR & GALLAGHER LLP

    MARK FILIP
    KIRKLAND & ELLIS LLP
    Counsel for Teva Pharmaceutical Industries Ltd.

## CERTIFICATE OF COUNSEL

The undersigned are outside counsel for Teva Pharmaceutical Industries Ltd. (the "Company") in the matter covered by this Agreement. In connection with such representation, the undersigned have examined relevant Company documents and have discussed the terms of this Agreement with the Company Board of Directors. Based on our review of the foregoing materials and discussions, we are of the opinion that the undersigned have been duly authorized by the Board of Directors of the Company to enter into this Agreement on behalf of the Company and that this Agreement has been duly and validly authorized, executed, and delivered on behalf of the Company and is a valid and binding obligation of the Company.

The undersigned have carefully reviewed the terms of this Agreement with the Board of Directors of the Company and have fully advised the Board of Directors of the rights of the Company, including of possible defenses, of the Sentencing Guidelines' provisions and of the consequences of entering into this Agreement. To our knowledge, the decision of the Company to enter into this Agreement, based on the authorization of the Board of Directors, is an informed and voluntary one.

Date: 12/22/2016

By: _____
MARTIN J. WEINSTEIN
WILLKIE FARR & GALLAGHER LLP

MARK FILIP
KIRKLAND & ELLIS LLP
Counsel for Teva Pharmaceutical Industries Ltd.

ATTACHMENT A

## STATEMENT OF FACTS

1.      The following Statement of Facts is incorporated by reference as part of the

Deferred Prosecution Agreement (the "Agreement") between the United States Department of

Justice, Criminal Division, Fraud Section (the "Fraud Section"), and Teva Pharmaceutical

Industries Ltd. ("Teva" or the "Company").   Certain of the facts herein are based on information

obtained from third parties by the Fraud Section through its investigation and provided to the

Company.  Teva hereby agrees and stipulates that the following information is true and accurate.

Teva admits, accepts, and acknowledges that it is responsible for the acts of its officers,

directors, employees, and agents as set forth below.  Should the Fraud Section pursue the

prosecution that is deferred by this Agreement, Teva agrees that it will neither contest the

admissibility of, nor contradict, this Statement of Facts in any such proceeding.  The following

facts establish beyond a reasonable doubt the charges set forth in the criminal Information

attached to this Agreement.  At all times relevant:

### Teva and Relevant Entities and Individuals

2.      Teva was an Israeli limited liability company with its headquarters in Petah

Tikva, Israel.  Teva was the world's largest manufacturer of generic pharmaceutical products.

Teva also manufactured patented pharmaceutical products, including Copaxone, which was used

in the treatment of multiple sclerosis.  Teva owned and controlled numerous consolidated

subsidiaries through which it marketed and sold pharmaceutical products in various countries

around the world.  Teva's American Depository Receipts ("ADRs") were traded on the Nasdaq

National Market from October 1987 until May 2012, when Teva's ADRs began to be traded on

A-1

the New York Stock Exchange ("NYSE").  Accordingly, since October 1987, Teva has been an "issuer" as that term is used in the Foreign Corrupt Practices Act ("FCPA"), Title 15, United States Code, Sections 78dd-1(a) and 78m(b).

3.      Teva LLC ("Teva Russia") was a limited liability company incorporated in the Russian Federation in 2010 and was a wholly-owned subsidiary of Teva.  Teva Russia, and its predecessor entities, operated on behalf, for the benefit, and under the control of Teva, and was principally responsible for the sale and marketing of Teva pharmaceutical products in Russia. Teva Russia was an "agent" of an issuer, Teva, within the meaning of the FCPA, Title 15, United States Code, Section 78dd-1(a).

4.      Teva Ukraine LLC ("Teva Ukraine") was a limited liability company incorporated in Ukraine and was a wholly-owned subsidiary of Teva.  Teva Ukraine operated on behalf, for the benefit, and under the control of Teva, and was principally responsible for the sale and marketing of Teva pharmaceutical products in Ukraine.  Teva Ukraine was an "agent" of an issuer, Teva, within the meaning of the FCPA, Title 15, United States Code, Section 78dd-1(a).

5.      Lemery S.A. de C.V., Sicor de Mexico S.A., Teva Pharmaceutical Mexico S.A. de C.V., Lemery Desarrolo y Control S.A. de C.V., Immobiliaria Lemery S.A. de C.V., IVAX Pharmaceuticals Mexico S.A. de C.V., and Vitrium Division Farmaceutica S.A. de C.V. (collectively, "Teva Mexico") were companies incorporated in Mexico and wholly-owned subsidiaries of Teva.  Teva Mexico was principally responsible for the sale and marketing of Teva pharmaceutical products in Mexico.

6.      Teva International Group ("TIG") was a unit of Teva that was principally responsible for overseeing Teva's operations in regions outside of the United States and Western

Europe, including in the Russian Federation, Ukraine, and Mexico. TIG was in operation from in or about 2002 until in or about mid-2010, at which point Teva underwent a corporate reorganization and TIG's responsibilities were absorbed by other Teva units.

7.     "Teva Executive," an Israeli citizen whose identity is known to the United States and the Company, was the senior Teva executive responsible for overseeing TIG between 2002 and 2010, and left the Company in 2014. Teva Executive was an "officer," "director," "employee," and "agent" of an issuer, Teva, within the meaning of the FCPA, Title 15, United States Code, Section 78dd-1(a).

8.     "Teva Russia Executive," a citizen of the Russian Federation whose identity is known to the United States and the Company, was a high-level executive at Teva Russia from in or about January 2006 until he left Teva Russia in or about September 2012. Teva Russia Executive was an "agent" of an issuer, Teva, within the meaning of the FCPA, Title 15, United States Code, Section 78dd-1(a).

9.     "Russian Official," a citizen of the Russian Federation whose identity is known to the United States and the Company, was a high-ranking government official in the Russian Federation, who held official positions on government committees. By virtue of his official position, Russian Official had the ability to influence matters related to the purchase of pharmaceutical products by the Russian government, including purchases made during annual auctions held by the Russian Ministry of Health. Russian Official was a "foreign official" within the meaning of the FCPA, Title 15, United States Code, 78dd-1(f)(1)(A).

10.     "Russian Company" was a group of companies incorporated in the Russian Federation, the identity of which is known to the United States and the Company. Russian

Company was a distributor, manufacturer and re-packager of pharmaceutical products in the Russian Federation. Russian Company was owned, controlled and managed by Russian Official. From at least in or about 2003 until at least 2013, Russian Company's controlling shares were held in the name of Russian Official's spouse, who was not involved in Russian Company's business operations.

11.     "Ukrainian Official," a Ukrainian citizen whose identity is known to the United States and the Company, was a high-ranking official within the Ukrainian Ministry of Health, who held official positions at government agencies and on government committees from at least 2001 to 2011. By virtue of his official positions, Ukrainian Official could take official action on, and exert official influence over, matters related to the registration and pricing of pharmaceutical products in Ukraine. Ukrainian Official was a "foreign official" within the meaning of the FCPA, Title 15, United States Code, 78dd-1(f)(1)(A).

12.     "Mexican Official," a Mexican citizen whose identity is known to the United States and the Company, from at least 2005 to 2012 was a well-known and influential neurologist in Mexico who treated patients suffering from multiple sclerosis. Mexican Official was employed by an instrumentality of the Mexican government and held senior positions at hospitals and other healthcare facilities owned and controlled by that instrumentality. Mexican Official was a "foreign official" within the meaning of the FCPA, Title 15, United States Code, 78dd-1(f)(1)(A).

13.     "Mexican Company," a limited liability company incorporated in Mexico whose identity is known to the United States and the Company, was a distributor of pharmaceutical products in Mexico. In 2011 and 2012, Mexican Company was retained by Teva Mexico to

A-4

distribute Copaxone to state-owned and state-managed hospitals and healthcare facilities in Mexico.

### Background on Teva International Pharmaceutical Sales

14.     The manufacture, registration, distribution, sale and prescription of pharmaceuticals were highly-regulated activities throughout the world.  Countries typically established regulatory schemes that required, among other things, the registration of pharmaceuticals.  In certain countries, including the Russian Federation, Ukraine, and Mexico, government entities were responsible for selecting which pharmaceuticals would be purchased by government institutions or ministries and for approving which pharmaceuticals would be eligible for government reimbursement.

15.     Copaxone was the brand-name of glatiramer acetate, a drug used in the treatment of multiple sclerosis, and was one of the few non-generic products sold by Teva.  A yearly prescription of Copaxone, which patients were required to take as a once-daily injection, cost up to tens of thousands of dollars.  During the relevant time period, Copaxone was Teva's most profitable product.

### The Unlawful Schemes

### Overview of the Schemes

16.     From 2006 through at least 2012, Teva, through its employees and agents, together with others, agreed that Teva would make corrupt payments to Russian Official, intending that Russian Official would use his official position and ability to influence the Russian government to purchase Copaxone through tender offers.  The payments were made through the high profit margins that Russian Company earned as Teva's repackager and

A-5

distributor of Copaxone for sales to the Russian Ministry of Health pursuant to the central government's drug purchase program.

17.    In addition, between 2001 and 2011, Teva, through its employees and agents, together with others, agreed to pay and provide things of value to Ukrainian Official to corruptly influence the Ukrainian government in approving the registration of Teva pharmaceutical products in Ukraine, which thereby allowed Teva to market and sell its products in the country.

18.    In furtherance of the schemes in Russia and Ukraine, employees and agents of Teva sent emails through the United States.  In furtherance of the improper payments in the Ukraine, Teva caused wire transfers to be made through U.S. financial institutions.

19.    Teva marketed and sold pharmaceutical products in countries with high corruption risks, including, among other places, Mexico.  Despite being aware of red flags and prior corruption-related misconduct at Teva's subsidiary in Mexico, Teva knowingly failed to implement an adequate system of internal accounting controls and failed to enforce the internal accounting controls it did have in place, including those requiring adequate due diligence of distributors and other third party agents, which resulted in improper payments being made in Mexico.

20.    Teva's total profits from the conduct described above in Russia, Ukraine and Mexico, were approximately $221,232,303.

**Russian Federation**

21.    The Russian Federation had a socialized public healthcare system that provided universal healthcare to Russian citizens, with the cost of medical care and drug treatments shared between the central, regional and local governments.  In or around late 2007, the Ministry of

Health designated seven illnesses and conditions as rare and expensive to treat and created a program whereby the central government would procure and supply to patients the necessary medications for treating these illnesses and conditions.  Among the covered illnesses was multiple sclerosis and treatment by Copaxone.  Since in or around 2008, Russian government purchases of Copaxone were primarily made by the Ministry of Health at usually bi-annual auctions.

22.     Employees of Teva, based in Israel, and employees of Teva Russia, at the direction of Teva Executive and others, sought to increase sales of Copaxone to the Russian government, including by doing business with companies owned and controlled by Russian Official, knowing that he was a high-level Russian government official at the time.

23.     On or about October 26, 2006, Teva Russia Executive emailed Teva Executive and another senior TIG Manager about a recent meeting with Russian Official, providing them with "an idea of the caliber of the person [by] citing below just a few of his formal titles and personal achievements."[1]  Teva Russia Executive described Russian Official's official position and explained that Russian Official was "the key lobbyist of pharma-related questions and issues" as well as a "key contact person for Knesset," the Israeli parliament.  Teva Russia Executive explained that Russian Official was the "owner of the local wholesaling company [Russian Company]" along with several other pharmaceutical companies.  Teva Russia Executive's email further noted that Russian Official's "influence in the industry" could benefit Teva by, among other things, allowing Teva to obtain "more speedy and straightforward registration of products."  Teva Russia Executive cautioned, however, that "the results [of

---

[1] Unless bracketed, all quotations appear as in the original document, without corrections or indications of misspellings or typographical errors.

A-7

Russia's] 2008 presidential elections can affect the status and scope of [Russian Official]'s influence."

24.     On or about October 26, 2006, Teva Executive replied to Teva Russia Executive that he "support[ed] exploring any kind of initiative which could strengthen our position in Russia."

25.     On or about February 8, 2008, Teva Russia Executive sent Teva Executive an email attaching a report about Russian Company.  In a section of the report detailing Russian Company's "management and corporate governance," Teva Russia Executive explained that "[t]ransparency of [Russian Company] should be considered low....  Participation of [Russian Official] and probably some local government officials in the ownership structure is well-known."

26.     In or about early October 2008, Teva managers, including Teva Executive, met with Russian Official and a Russian Company executive in Israel.  The meeting had been arranged by Russian Company's Director of Sales and Marketing.

27.     On or about October 7, 2008, Russian Company's Director of Sales and Marketing emailed Teva Executive to follow-up on matters discussed during the meeting.  The email reiterated that Russian Company was "interested to participate in the delivery and distribution of Copaxone," and explained that the Russian government had already "defined" the government's order for Copaxone for 2009.  The email also mentioned possible "future scenarios" that could affect the "decision making" related to Copaxone sales, reminded Teva Executive that Russian Official had had "personal involvement … in the introduction of Copaxone and other important healthcare initiatives in Russia," and explained that "it will be

A-8

beneficial for Teva to grant the distribution of Copaxone to [Russian Company] in full or partially."

28.     Between in or around October 2008 and in or around January 2009, Teva employees, including Teva Executive, learned that the Russian Company executive was under investigation in Russia for corruption and that Teva's risk insurance provider had decided to stop insuring transactions with Russian Company.

29.     In or around late 2008 or early 2009, after the meeting and email described in Paragraphs 26 and 27, Teva Executive, Teva Russia Executive, and others agreed that Teva would grant Russian Company the right to distribute Copaxone in Russia, intending that Russian Official would use his official position and ability to influence to increase sales of Copaxone to the Russian government. From early 2009 until in or about mid-2010, Teva employees explored various possibilities for Russian Company to sell Copaxone.

30.     On or about March 7, 2009, Russian Company's Director of Sales and Marketing emailed Teva Executive with information about a public tender for the purchase of Copaxone that had been announced by the Russian Academy of Medical Sciences ("RAMS"). The email explained that Russian Company's "top management has first hand relations with RAMS" and that the tender offered "a very good chance to push further up Copaxone positioning in Russia, since RAMS and its President have [a] significant role in influencing the opinion of medical and political stratum in Russia."

31.     On or about March 8, 2009, Teva Executive forwarded the foregoing email to a senior TIG executive with the note, "[t]his is an interesting offer as this is [Russian Official]'s domain/specialty. Pls look into this and advise soonest."

32.     On or about March 10, 2009, the senior TIG executive forwarded Teva Executive's email to Teva Russia Executive, who confirmed that Russian Company had "a strong position in this establishment." Teva Russia Executive explained that he was aware of the issue and was already dealing with a Russian Company employee who "reports directly to [Russian Official]." In or around mid-2009, the Russian government announced a new strategy for the Russian Federation's domestic pharmaceutical industry, known as "Pharma 2020." The goals of the new strategy involved, among other things, an import phase-out and changes to the procurement of pharmaceutical products, primarily by establishing a preference for domestic products. These changes started to apply in early 2009 and affected purchases made through the Russian government's annual procurement auction program. Under the law, as announced, repackaging of a foreign pharmaceutical product inside the Russian Federation could qualify for the domestic preference under Pharma 2020.

33.     In or around mid-2010, Teva reorganized its business and eliminated the TIG business unit. Teva Russia was put under the newly-created EMIA business unit.

34.     In or around mid-2010, Teva Russia employees, including Teva Russia Executive, agreed with Russian Official and others on a plan for Russian Company to be Teva's repackager and distributor for Copaxone sales to the Russian government. Russian Company would repackage and distribute Copaxone on behalf of Teva. As set forth below, Teva hoped that Russian Official would use his political network and official influence to benefit Teva to support maintaining or increasing the amount of Copaxone sold to the Russian government.

35.     In or around early August 2010, a Russian Company employee emailed Teva Russia Executive to request that Russian Company receive a larger discount on sales to a

Russian government customer.  On or about August 5, 2010, Teva Russia Executive forwarded the complaint to the manager of Teva Russia's Innovative Business Unit, requesting that Russian Company be granted a larger discount.  The Teva Russia manager opposed giving Russian Company "any additional concessions," but Teva Russia Executive wrote back, suggesting that Teva Russia should consider the request as "the cost of building a relationship with [Russian Official]," as "this year, there was a substantial increase in the Copaxone requests from the [RAMS]," and Teva Russia "may benefit from [Russian Official's] support in other areas as well."

36.     In or around late August 2010, Teva Russia employees provided a draft of the proposed Copaxone repackaging and distribution agreement between Teva and Russian Company to Teva employees in Israel.

37.     On or about September 12, 2010, a Teva Russia executive emailed the Finance Director for Teva's Copaxone business unit and other Teva managers and executives in Israel to provide the "rationale for the new scheme of Copaxone business in Russia."  The email explained that "this year the Russian Government has been contining to interfere into pharmaceutical market functioning.  Thus it has been continuing its pressure on prices especially on those products that being of high price are paid by the state budget."  The email further explained that the focus of this price pressure had been "expensive imported products paid by the government," including Copaxone, and that the Russian government was seeking to "encourage[] competition intensification by both fast track registration of the new competing products (one was registered this summer for MS treatment and we expect it takes part in the MS tender this fall) and supporting fast development and introduction of the local glatiramoids (they

A-11

call them, of course, 'Copaxone's generics')."  In the email, the Teva Russia executive stated that

this "and some other new factors produced a serious threats for the Copaxone business in 2011."

As a result, "partnership with a robust influential local player was identified as the proper

solution to the above challenges."  The email stated that the partner was "supposed to lobby

Copaxone in the state tender."  He explained that Russian Company "was found as the right

company capable to assure keeping Copaxone's share and its price and even r[a]ising them both

up."

38.     In his email to Teva executives, the Teva Russia executive asked for their

approval of the proposed Russian Company repackaging and distribution agreement "as soon as

possible."  The email explained that "if we do not have the supply agreement approved and

signed by [the] mid[dle] of this week we will encounter very real threat of losing a 100 million

USD Copaxone business in 2011."

39.     On or about September 12, 2010, a Teva Russia manager emailed Teva executives

in Israel with additional information supporting Teva Russia's request.  The email noted that

Russian Company was headed by Russian Official, listed Russian Official's official positions on

various government committees, and explained that "the plan" was to use Russian Official's

contacts, including at the Ministry of Health, to maintain Copaxone's share of the market,

including by minimizing the risk that a generic version of Copaxone would be approved by the

Russian government, thereby reducing Teva's market share.

40.     On or about September 12 and 13, 2010, Teva Russia Executive sent emails to

senior Teva executives in Israel requesting them to sign off on the agreement with Russian

Company immediately.

41.    On or about September 14, 2010, a Teva Russia senior manager emailed Teva Russia Executive and described a meeting he had just had with Russian Official.  The email said that Russian Official had told him that the Minister of Health "had returned from a vacation and asked in the morning if there was a confirmation that the entire project … would take place." The email explained that Russian Official was concerned that Teva would refuse to approve the agreement with Russian Company, and that Russian Official had threatened that "both the price and the supply volumes would be purposefully 'lowered' if a partnership with him was not established."

42.    On or about September 15, 2010, Teva executives agreed to enter into the Copaxone repackaging and distribution agreement with Russian Company.

43.    On or about October 7, 2010, Teva Russia's Legal Director initiated the internal process to formally enter into the agreement with Russian Company.  Consistent with Teva's anti-corruption policy as it related to third-party agreements, the Legal Director submitted a completed questionnaire about the Russian Company agreement to Teva for review and approval.  In transmitting the materials, the Legal Director stated that the "deal value is about US$ 100 million for 2011 sales" and asked for immediate review, calling the deal "rather urgent."  The email and supporting information stated that Russian Official's wife was the owner of the company but did not include that Russian Official ran the business.  The email also omitted facts known to Teva Russia Executive and other Teva Russia employees, including details about the corruption investigation by Russian authorities against the Russian Company executive and information from Russian news media reports on Russian Official's alleged

involvement in corruption related to Russian government drug procurement auctions going back to 2006.

44.     On or about October 8, 2010, a Teva Finance Department manager with responsibility for approving compliance-related requests for the EMIA region directed a Finance employee to forward the compliance questionnaire concerning the Russian Company agreement to the Regional Compliance Officer and to Teva Russia's CFO for, among other things, due diligence to be conducted.

45.     On or about October 9, 2010, in response to an inquiry about the status of due diligence on Russian Company, a senior EMIA executive sent an email to another high-ranking EMIA executive explaining that Teva Russia Executive would be leading the due diligence process.  As set forth above, at the time, Teva Russia Executive had been pushing for the agreement between Teva Russia and Russian Company.

46.     On or about October 21, 2010, the EMIA Regional Compliance Officer approved the agreement between Teva and Russian Company.

47.     On or about October 28, 2010, Teva executed the framework agreement with Russian Company, which included granting Russian Company the right to repackage and distribute Copaxone in the Russian Federation as well as an incentive agreement with payments tied to increasing sales targets.  At the same time Teva entered into the distribution agreement with Russian Company, Teva terminated an agreement with the Russian company that had distributed Copaxone at several prior Ministry of Health auctions and agreed to pay that company a substantial "bonus" payment as part of the termination.

A-14

48.     On or about November 12, 2010, the Russian Ministry of Health awarded Russian Company the contract to supply the Russian government with glatiramer acetate for its tender.

49.     On or about December 13, 2010, a Teva Russia executive communicated via email with a senior manager at Russian Company regarding matters related to the recently-awarded contract to supply Copaxone to the Russian government.

50.     On or about December 30, 2010, Teva Russia Executive emailed a senior EMIA executive about a meeting the executive was scheduled to have with Russian Official.  In preparing the executive for the meeting, Teva Russia Executive explained Russian Official's position and influence in the Russian government and stated that the "state channel is a key one for his businesses."  Teva Russia Executive explained that "the dilemma [Russian Official] faces is how to protect his positions under conditions when state funded business in Russia is becoming transparent."  Among other things, Teva Russia Executive asked the senior EMIA executive to "push [Russian Official] to demand more funding for Copaxone [] in early 2011" and to "obtain his commitment in protecting Copaxone (access to the Minister [of Health] and [Ministry of Health] decision makers, leveraging Senate capabilities)."

51.     On or about January 2, 2011, the senior EMIA executive emailed Teva Russia Executive about his meeting with Russian Official, stating that Russian Official "strongly encourages us to strengthen our influence with Regional Government Neurologist Representatives, to ensure in the future Copaxone volumes are protected."

52.     On or about January 24, 2012, Russian Company was awarded another contract by the Russian Ministry of Health to supply the government with Copaxone.

53.     Teva terminated its repackaging and distribution relationship with Russian
Official and Russian Company in the middle of 2013 as a result of Russian Company's refusal to
follow Teva's due diligence procedures.

54.     During the time that Russian Company was Teva's repackager and distributor for
Copaxone, Teva earned profits of approximately $204,167,303 on sales made by Russian
Company to the Russian government.

### Ukraine

55.     Ukraine had a socialized healthcare system, with the national Ministry of Health
coordinating the provision of healthcare to its citizens with regional and local counterparts.  Most
healthcare services were provided through government-owned healthcare facilities.
Pharmaceutical products were regulated by agencies under the Ukrainian Ministry of Health.  In
Ukraine, drugs were permitted for marketing and sale in Ukraine only after registration by the
state, which included clinical testing and examination as part of the approval process.  In
Ukraine, medications for certain socially significant or especially serious illnesses, including
multiple sclerosis, were dispensed free by the government.

56.     During the relevant time period, Ukrainian Official held senior positions within
the agencies under the Ukrainian Ministry of Health responsible for registering and approving
drugs for marketing and sale in Ukraine.  In those official positions, Ukrainian Official had the
ability to influence the Ukrainian government's decision to approve the registration of
pharmaceutical products.

57.     Teva operated directly in Ukraine until in or around 2007, at which time Teva
began operating through subsidiaries, including Teva Ukraine in 2010.

58.     In or around August 2001, Teva, through its employees and agents, engaged Ukrainian Official as a third-party "registration consultant" and entered into consulting agreements to pay Ukrainian Official a monthly "consultancy fee." In addition to the monthly payments, Teva, through its employees and agents, provided Ukrainian Official with cash bonuses, travel expenses and other things of value. The consulting agreement between Teva and Ukrainian Official was renewed annually, on the same terms, until in or around late 2011.

59.     The payments under the agreements between Teva and Ukrainian Official were made for the purpose of inducing Ukrainian Official to use his official position within the Ukrainian government to improperly influence the registration of Teva pharmaceutical products in Ukraine.

60.     On or about May 26, 2003, an invoice prepared at Ukrainian Official's direction asked Teva "to transfer to me by cash $15,000 as the follow-up fee payment for registration of Insulins in Ukraine."

61.     On or about June 8, 2003, Teva entered into an agreement extending Ukrainian Official's engagement. The agreement was signed by Teva Executive on behalf of Teva.

62.     On or about May 24, 2004, an invoice prepared at Ukrainian Official's direction asked Teva "to transfer to me by cash $20,000 as the last follow-up payment for registration of Insulins in Ukraine after reception of Registration certificate."

63.     On or about March 26, 2006, the TIG manager responsible for approving expenses related to the agreement between Teva and Ukrainian Official approved a request that Teva pay for Ukrainian Official's travel expenses to Israel. The request stated that Ukrainian Official "is a great help to us in the promotion of Copaxone and insulins in the Ukrainian market.

A-17

One way we can repay him is by financing his visits to Israel once a year." The approved request included approximately $4,400 worth of travel expenses for Ukrainian Official and his wife.

64.     On or about October 5, 2006, an invoice prepared at Ukrainian Official's direction asked Teva to "transfer to my [] account $10,000 for the expenses of Copaxone registration in Ukraine." The Teva employee responsible for making the payment identified the amount as a "Bonus for Copaxone registration."

65.     In or around January 2008, Teva, through Teva Ukraine, sought registration of one of its products from the Ukrainian governmental authority responsible for the registration of pharmaceutical products. Teva Ukraine's submission was addressed and sent to Ukrainian Official, who was then a high-level official at the governmental authority.

66.     On or about April 24, 2008, Ukrainian Official was appointed by the President of Ukraine to become the Deputy Chairman of a Ukrainian government committee responsible for issues of "price-formation for drugs and other medicinal products, public purchases and drugs registration."

67.     On or about June 29, 2008, an invoice prepared at Ukrainian Official's direction asked Teva to "transfer to my [] account $10,000 for the expenses of Copaxone promotion in the Ukraine."

68.     On or about July 21, 2008, Teva sent a wire transfer totaling $10,000 through an intermediary bank account in New York, which was subsequently paid onward to a bank account in Ukraine held by Ukrainian Official.

69.     On or about May 20, 2009, an invoice prepared at Ukrainian Official's direction requested payment for $16,500 as a "consultancy fee" from Teva for September 2008 through June 2009.

70.     On or about June 25, 2009, Teva sent a wire transfer totaling $16,500 through an intermediary bank account in New York which was subsequently paid onward to an account in Ukraine held by Ukrainian Official.

71.     Teva stopped paying Ukrainian Official at the end of 2009.  Thereafter, Teva Ukraine took over payments to Ukrainian Official under the agreement until the expiration of the agreement until March 2011.

72.     From in or around June 2002 through approximately March 2011, Teva and Teva Ukraine paid cash and provided other things of value to Ukrainian Official worth a total of approximately $200,000.

**Teva's Failure to Implement Adequate Internal Accounting Controls in Mexico**

73.     At all relevant times, Teva marketed and sold pharmaceutical products in countries with high corruption risks, including, among other places, Mexico.  Despite understanding the nature of the corruption risks presented by doing business in Mexico and awareness of red flags and prior corruption-related misconduct at Teva's subsidiary in Mexico, Teva knowingly and willfully failed to implement an adequate system of internal accounting controls and failed to enforce the internal accounting controls it did have in place, which in turn failed to prevent improper payments from being made in Mexico.

74.     For example, in or around 2011 and 2012, Teva Mexico, through its executives, employees and agents, used its third-party distributor, Mexican Company, to make payments to

physicians and other healthcare providers (collectively "HCPs"). Some of the HCPs paid by Mexican Company had received payments from Teva Mexico and its predecessor entities in exchange for prescribing Copaxone since at least 2005. The existence and improper nature of these payments was known to Teva executives who were responsible for developing and approving the Company's anti-corruption internal controls in 2009.

75.     On or about November 6, 2008, Mexican Official emailed a Teva employee responsible for the Copaxone business to complain about Teva Mexico's failure to make certain payments. Mexican Official wrote, "TEVA Mexico was promises promises & promises and there was never any interest in order to improve our relationship." Mexican Official said the lack of payment was "really strange when I'm your best client in Mexico." In the email, Mexican Official noted that he was prescribing Copaxone to approximately 170 patients, making him one of the largest prescribers in the region. On or about November 12, 2008, the email was forwarded to Teva Executive, who then emailed a senior Teva Mexico executive, "I'd appreciate having your good inputs and trust that [Mexican Official's] problem can be resolved. After all, [it's] not every day we get a complaint from a professor that has 170 Copaxone patients."

76.     In or around December 30, 2008, the senior Teva Mexico executive emailed Teva Executive and explained, "[t]he growth of Copaxone in this market, until very recently, was not due to scientific/academic support but mostly to other incentives." These "other incentives," which included payments in exchange for prescribing Copaxone, were paid out of Teva Mexico's Copaxone marketing and promotions budget.

77.     Numerous Teva executives involved in developing, approving and implementing the Company's anti-corruption program, including Teva Executive, were aware that the policies

and procedures they approved were not adequate to prevent or detect improper payments to foreign officials. These executives also understood that the internal controls were not adequate to meet the risks posed by Teva's business and, indeed, had intended such a result.

78.     Teva executives also put in place managers to oversee the compliance function who were unable or unwilling to enforce the Company's anti-corruption policies. For example, on or about January 17, 2011, at a meeting of the Company's compliance team that oversaw Teva Mexico, while discussing whether the compliance department would approve certain payments, the Regional Compliance Officer expressed an opinion that "Compliance['s] role will be [to] not interfere with the ultimate decision made by Business Heads." During this same time period, the Regional Compliance Officer also "emphasized that the compliance program, current local policy and Sales and Marketing guidelines were not relevant for the [Latin America] region and were to be ignored."

79.     On or about April 12, 2011, a Teva employee responsible for overseeing the implementation of the anti-corruption controls emailed a senior executive responsible for overseeing compliance in Latin America. The email explained that a senior Teva executive had "specifically instructed not to implement a robust system that will enable us to monitor and assure that the same doctor wasn't invited to a meal more than three times (for example)" and that the purpose of a system to track payments was "mainly to automate the manual forms."

80.     In or around early 2011, Teva reduced the budget for marketing and promotion of Copaxone in various countries, including Mexico. As a result, Teva Mexico no longer had sufficient funds to pay the government HCPs to whom it had been making payments. In or around early 2011, after the reduction in their marketing and promotions budget, employees in

the Teva Mexico group responsible for sales of Copaxone agreed to continue the payments to the government HCPs in the form of cash payments made by Mexican Company, which was a Teva Mexico distributor for sales of Copaxone to government institutions.

81.    On or about November 15, 2011, a Teva employee with responsibility for financial controls over Teva Mexico prepared a memorandum detailing perceived deficiencies in the internal accounting controls for Teva operations in Latin America.  The memorandum concluded: "[w]e cannot guarantee that we are not (1) executing payments that would violate FCPA anti-bribery provisions and (2) properly accounting for any such payments under the books and records provision of the FCPA."

82.    In or around January 2012, employees of Teva Mexico met with employees of Mexican Company, and agreed to provide Mexican Company with an additional margin of 2% on sales by Mexican Company to its government customers.  The purpose of the 2% margin was to pay the government HCPs in exchange for their writing prescriptions of Copaxone.

83.    Between on or about February 16, 2012 and March 6, 2012, using the additional margins provided under the agreement with Teva Mexico, a Mexican Company employee delivered cash payments to at least seven HCPs employed by Mexican state-owned or state-managed hospitals and healthcare facilities.

84.    On or about March 15, 2012, a Mexican Company employee emailed a Teva Mexico employee with "a report as to how the delivery to the physicians was made."  In the email, the Mexican Company employee detailed the time and place of the improper payments, including approximately $30,000 paid to Mexican Official at Mexican Official's office on or about the morning of February 17, 2012.  In total, the Mexican Company employee's email

detailed approximately $159,000 in cash payments to the government HCPs.  Teva Mexico described these improper payments, funded through the provision of the additional 2% margin to Mexican Company, as legitimate reductions of revenue in its books and records.

85.     Prior to engaging Mexican Company as a distributor, Teva Mexico conducted no due diligence on Mexican Company, did not have a written distribution agreement in place, did not require Mexican Company to certify its compliance with Teva's anti-corruption policies, and knew there was no legitimate purpose for an increased margin Mexican Company had received on sales to Mexican government customers.

ATTACHMENT B

**CERTIFICATE OF CORPORATE RESOLUTIONS**

WHEREAS, Teva Pharmaceutical Industries Ltd. (the "Company") has been engaged in discussions with the United States Department of Justice, Criminal Division, Fraud Section (the "Fraud Section") regarding issues relating to the U.S. Foreign Corrupt Practices Act, including those involving Company's indirect subsidiary Teva LLC ("Teva Russia");

WHEREAS, in order to resolve such discussions, it is proposed that the Company enter into a deferred prosecution agreement (the "Agreement") with the Fraud Section and that Teva Russia enter into a plea agreement (the "Plea Agreement") with the Fraud Section;

WHEREAS, the Board of Directors of the Company has fully reviewed the terms of the Agreement and Plea Agreement with Martin J. Weinstein, Esq., a partner at the law firm Willkie Farr & Gallagher LLP, and Mark Filip, Esq., a partner at the law firm Kirkland & Ellis, LLP, outside counsel for the Company and for Teva Russia (collectively "Teva Outside Counsel");

WHEREAS, Teva Outside Counsel have fully advised the Board of Directors of the Company of its and Teva Russia's rights, possible defenses, the Sentencing Guidelines' provisions, and the consequences of entering into the Agreement and Teva Russia entering into the Plea Agreement the with the Fraud Section;

WHEREAS, no promises or inducements have been made other than those contained in this Agreement and the Plea Agreement and no one has threatened or forced the Company or Teva Russia, or any person acknowledging such agreements on behalf of the Company or Teva Russia, in any way to enter into such agreements, or to authorize Teva Outside Counsel to take actions on their behalf with respect to such agreements;

WHEREAS, the Company understands the terms of the Agreement and voluntarily agrees to each of its terms; and

WHEREAS, the Board of Directors of the Company is fully satisfied with Teva Outside Counsel's representation in this matter;

Therefore, the Board of Directors has RESOLVED that:

1.     The Company (a) acknowledges the filing of the two-count Information charging the Company with one count of conspiracy to violate the Foreign Corrupt Practices Act of 1977 ("FCPA"), as amended, Title 15, United States Code, Section 78dd-1, in violation of Title 18, United States Code, Section 371; and one count of violating the FCPA, contrary to Title 15, United States Code, Sections 78m(b)(2)(B), 78m(b)(5), and 78ff(a); (b) waives indictment on such charges and enters into a deferred prosecution agreement with the Fraud Section; and (c) agrees to accept a monetary penalty against Company totaling $283,177,348, and to pay such penalty to the United States Treasury with respect to the conduct described in the Information;

2.     The Company accepts the terms and conditions of this Agreement, including, but not limited to, (a) a knowing waiver of its rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b); and (b) a knowing waiver for purposes of this Agreement and any charges by the United States arising out of the conduct described in the Statement of Facts of any objection with respect to venue and consents to the filing of the Information, as provided under the terms of this Agreement, in the United States District Court for the Southern District of Florida; and (c) a knowing waiver of any defenses based on the statute of limitations for any prosecution relating to the conduct described in the Statement of Facts or relating to conduct known to the Fraud Section prior to the date on which this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement;

3.    All corporate entities subsidiary to the Company necessary to facilitate the execution and delivery of the Plea Agreement on behalf of Teva Russia are authorized, empowered and directed to execute and deliver the Plea Agreement substantially in such form as reviewed by the Board of Directors at this meeting and take such actions as necessary and appropriate to carry out and effectuate the purpose and intent of the foregoing resolutions.

4.    Teva Outside Counsel are hereby each individually authorized, empowered and directed, on behalf of the Company, and its indirect subsidiary Teva Russia to execute and deliver the Deferred Prosecution Agreement and the Plea Agreement substantially in such form as reviewed by this Board of Directors at this meeting;

5.    Teva Outside Counsel are hereby each individually authorized, empowered and directed to take any and all actions as may be necessary or appropriate, and to approve the forms, terms or provisions of any agreement or other documents as may be necessary or appropriate to carry out and effectuate the purpose and intent of the foregoing resolutions (including execution and delivery of any such agreement or document on behalf of the Company and Teva Russia); and

6.    All of the actions of Teva Outside Counsel, which actions would have been within the scope of and authorized by the foregoing resolutions except that such actions were taken prior to the adoption of such resolutions, are hereby severally ratified, confirmed, approved, and adopted as actions on behalf of the Company.

I, Dov Bergwerk, a duly authorized representative of Teva Pharmaceutical Industries Ltd., a company incorporated under the laws of Israel, do hereby certify that the foregoing is a true and correct copy of certain resolutions adopted by the Board of Directors of Teva Pharmaceutical Industries Ltd. at a meeting held on December 13, 2016, at which a quorum of the Board of

Directors was present and that such resolutions remain in full force and effect as of the date

hereof.

Date: ___12/14/16___            By: _____

Dov Bergwerk, Adv.
SVP, General Counsel – Corporate Affairs
Corporate Secretary
TEVA PHARMACEUTICAL
INDUSTRIES LTD.

ATTACHMENT C

## CORPORATE COMPLIANCE PROGRAM

In order to address any deficiencies in its internal controls, compliance code, policies, and procedures regarding compliance with the Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. §§ 78dd-1, *et seq.,* and other applicable anti-corruption laws, Teva Pharmaceutical Industries Ltd. (the "Company") agrees to continue to conduct, in a manner consistent with all of its obligations under this Agreement, appropriate reviews of its existing internal controls, policies, and procedures.

Where necessary and appropriate, the Company agrees to adopt new or to modify existing internal controls, compliance code, policies, and procedures in order to ensure that it maintains: (a) a system of internal accounting controls designed to ensure that the Company makes and keeps fair and accurate books, records, and accounts; and (b) a rigorous anti-corruption compliance program that includes policies and procedures designed to detect and deter violations of the FCPA and other applicable anti-corruption laws. At a minimum, this should include, but not be limited to, the following elements to the extent they are not already part of the Company's existing internal controls, compliance code, policies, and procedures:

*High-Level Commitment*

1.     The Company will ensure that its directors and senior management provide strong, explicit, and visible support and commitment to its corporate policy against violations of the anti-corruption laws and its compliance code.

C-1

*Policies and Procedures*

2.      The Company will develop and promulgate a clearly articulated and visible corporate policy against violations of the FCPA and other applicable foreign law counterparts (collectively, the "anti-corruption laws,"), which policy shall be memorialized in a written compliance code.

3.      The Company will develop and promulgate compliance policies and procedures designed to reduce the prospect of violations of the anti-corruption laws and the Company's compliance code, and the Company will take appropriate measures to encourage and support the observance of ethics and compliance policies and procedures against violation of the anti-corruption laws by personnel at all levels of the Company.  These anti-corruption policies and procedures shall apply to all directors, officers, and employees and, where necessary and appropriate, outside parties acting on behalf of the Company in a foreign jurisdiction, including but not limited to, agents and intermediaries, consultants, representatives, distributors, teaming partners, contractors and suppliers, consortia, and joint venture partners (collectively, "agents and business partners").  The Company shall notify all employees that compliance with the policies and procedures is the duty of individuals at all levels of the company.  Such policies and procedures shall address:

        a.      gifts;

        b.      hospitality, entertainment, and expenses;

        c.      customer travel;

        d.      political contributions;

        e.      charitable donations and sponsorships;

C-2

      f.     facilitation payments; and

      g.     solicitation and extortion.

    4.     The Company will ensure that it has a system of financial and accounting procedures, including a system of internal controls, reasonably designed to ensure the maintenance of fair and accurate books, records, and accounts.  This system should be designed to provide reasonable assurances that:

      a.     transactions are executed in accordance with management's general or specific authorization;

      b.     transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and to maintain accountability for assets;

      c.     access to assets is permitted only in accordance with management's general or specific authorization; and

      d.     the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

*Periodic Risk-Based Review*

    5.     The Company will develop these compliance policies and procedures on the basis of a periodic risk assessment addressing the individual circumstances of the Company, in particular the foreign bribery risks facing the Company, including, but not limited to, its geographical organization, interactions with various types and levels of government officials, industrial sectors of operation, involvement in joint venture arrangements, importance of licenses

and permits in the Company's operations, degree of governmental oversight and inspection, and volume and importance of goods and personnel clearing through customs and immigration.

6.      The Company shall review its anti-corruption compliance policies and procedures no less than annually and update them as appropriate to ensure their continued effectiveness, taking into account relevant developments in the field and evolving international and industry standards.

*Proper Oversight and Independence*

7.      The Company will assign responsibility to one or more senior corporate executives of the Company for the implementation and oversight of the Company's anti-corruption compliance code, policies, and procedures.  Such corporate official(s) shall have the authority to report directly to independent monitoring bodies, including internal audit, the Company's Board of Directors, or any appropriate committee of the Board of Directors, and shall have an adequate level of autonomy from management as well as sufficient resources and authority to maintain such autonomy.

*Training and Guidance*

8.      The Company will implement mechanisms designed to ensure that its anti-corruption compliance code, policies, and procedures are effectively communicated to all directors, officers, employees, and, where necessary and appropriate, agents and business partners.  These mechanisms shall include: (a) periodic training for all directors and officers, all employees in positions of leadership or trust, positions that require such training (e.g., internal audit, sales, legal, compliance, finance), or positions that otherwise pose a corruption risk to the Company, and, where necessary and appropriate, agents and business partners; and (b)

C-4

corresponding certifications by all such directors, officers, employees, agents, and business partners, certifying compliance with the training requirements.

9.      The Company will maintain, or where necessary establish, an effective system for providing guidance and advice to directors, officers, employees, and, where necessary and appropriate, agents and business partners, on complying with the Company's anti-corruption compliance code, policies, and procedures, including when they need advice on an urgent basis or in any foreign jurisdiction in which the Company operates.

*Internal Reporting and Investigation*

10.     The Company will maintain, or where necessary establish, an effective system for internal and, where possible, confidential reporting by, and protection of, directors, officers, employees, and, where appropriate, agents and business partners concerning violations of the anti-corruption laws or the Company's anti-corruption compliance code, policies, and procedures.

11.     The Company will maintain, or where necessary establish, an effective and reliable process with sufficient resources for responding to, investigating, and documenting allegations of violations of the anti-corruption laws or the Company's anti-corruption compliance code, policies, and procedures.

*Enforcement and Discipline*

12.     The Company will implement mechanisms designed to effectively enforce its compliance code, policies, and procedures, including appropriately incentivizing compliance and disciplining violations.

13.     The Company will institute appropriate disciplinary procedures to address, among other things, violations of the anti-corruption laws and the Company's anti-corruption compliance code, policies, and procedures by the Company's directors, officers, and employees. Such procedures should be applied consistently and fairly, regardless of the position held by, or perceived importance of, the director, officer, or employee. The Company shall implement procedures to ensure that where misconduct is discovered, reasonable steps are taken to remedy the harm resulting from such misconduct, and to ensure that appropriate steps are taken to prevent further similar misconduct, including assessing the internal controls, compliance code, policies, and procedures and making modifications necessary to ensure the overall anti-corruption compliance program is effective.

*Third-Party Relationships*

14.     The Company will institute appropriate risk-based due diligence and compliance requirements pertaining to the retention and oversight of all agents and business partners, including:

a.     properly documented due diligence pertaining to the hiring and appropriate and regular oversight of agents and business partners;

b.     informing agents and business partners of the Company's commitment to abiding by anti-corruption laws, and of the Company's anti-corruption compliance code, policies, and procedures; and

c.     seeking a reciprocal commitment from agents and business partners.

15.     Where necessary and appropriate, the Company will include standard provisions in agreements, contracts, and renewals thereof with all agents and business partners that are

reasonably calculated to prevent violations of the anti-corruption laws, which may, depending upon the circumstances, include:  (a) anti-corruption representations and undertakings relating to compliance with the anti-corruption laws; (b) rights to conduct audits of the books and records of the agent or business partner to ensure compliance with the foregoing; and (c) rights to terminate an agent or business partner as a result of any breach of the anti-corruption laws, the Company's compliance code, policies, or procedures, or the representations and undertakings related to such matters.

*Mergers and Acquisitions*

16.     The Company will develop and implement policies and procedures for mergers and acquisitions requiring that the Company conduct appropriate risk-based due diligence on potential new business entities, including appropriate FCPA and anti-corruption due diligence by legal, accounting, and compliance personnel.

17.     The Company will ensure that the Company's compliance code, policies, and procedures regarding the anti-corruption laws apply as quickly as is practicable to newly acquired businesses or entities merged with the Company and will promptly:

    a.     train the directors, officers, employees, agents, and business partners consistent with Paragraph 8 above on the anti-corruption laws and the Company's compliance code, policies, and procedures regarding anti-corruption laws; and

    b.     where warranted, conduct an FCPA-specific audit of all newly acquired or merged businesses as quickly as practicable.

*Monitoring and Testing*

18.     The Company will conduct periodic reviews and testing of its anti-corruption compliance code, policies, and procedures designed to evaluate and improve their effectiveness in preventing and detecting violations of anti-corruption laws and the Company's anti-corruption code, policies, and procedures, taking into account relevant developments in the field and evolving international and industry standards.

ATTACHMENT D

**INDEPENDENT COMPLIANCE MONITOR**

The duties and authority of the Independent Compliance Monitor (the "Monitor"), and the obligations of Teva Pharmaceutical Industries Ltd. (the "Company"), on behalf of itself and its subsidiaries and affiliates, with respect to the Monitor and the United States Department of Justice, Criminal Division, Fraud Section (the "Fraud Section"), are as described below:

1.      The Company will retain the Monitor for a period of three (3) years (the "Term of the Monitorship"), unless the early termination provision of Paragraph 3 of the Deferred Prosecution Agreement (the "Agreement") is triggered.

*Monitor's Mandate*

2.      The Monitor's primary responsibility is to assess and monitor the Company's compliance with the terms of the Agreement, including the Corporate Compliance Program in Attachment C, so as to specifically address and reduce the risk of any recurrence of the Company's misconduct.  During the Term of the Monitorship, the Monitor will evaluate, in the manner set forth below, the effectiveness of the internal accounting controls, record-keeping, and financial reporting policies and procedures of the Company as they relate to the Company's current and ongoing compliance with the FCPA and other applicable anti-corruption laws (collectively, the "anti-corruption laws") and take such reasonable steps as, in his or her view, may be necessary to fulfill the foregoing mandate (the "Mandate").  This Mandate shall include an assessment of the Board of Directors' and senior management's commitment to, and effective implementation of, the corporate compliance program described in Attachment C of the Agreement.

D-1

*Company's Obligations*

3.      The Company shall cooperate fully with the Monitor, and the Monitor shall have the authority to take such reasonable steps as, in his or her view, may be necessary to be fully informed about the Company's compliance program in accordance with the principles set forth herein and applicable law, including applicable data privacy, national security, and labor laws and regulations.  To that end, the Company shall: facilitate the Monitor's access to the Company's documents and resources; not limit such access, except as provided in Paragraphs 5-6; and provide guidance on applicable local law (such as relevant data privacy, national security, and labor laws and regulations).  The Company shall provide the Monitor with access to all information, documents, records, facilities, and employees, as reasonably requested by the Monitor, that fall within the scope of the Mandate of the Monitor under the Agreement.  The Company shall use its best efforts to provide the Monitor with access to the Company's former employees and its third-party vendors, agents, and consultants.

4.      Any disclosure by the Company to the Monitor concerning corrupt payments, false books and records, and internal accounting control failures shall not relieve the Company of any otherwise applicable obligation to truthfully disclose such matters to the Fraud Section, pursuant to the Agreement.

*Withholding Access*

5.      The parties agree that no attorney-client relationship shall be formed between the Company and the Monitor.  In the event that the Company seeks to withhold from the Monitor access to information, documents, records, facilities, or current or former employees of the Company that may be subject to a claim of attorney-client privilege or to the attorney work-

D-2

product doctrine, or where the Company reasonably believes production would otherwise be inconsistent with applicable law, the Company shall work cooperatively with the Monitor to resolve the matter to the satisfaction of the Monitor.

6.      If the matter cannot be resolved, at the request of the Monitor, the Company shall promptly provide written notice to the Monitor and the Fraud Section.  Such notice shall include a general description of the nature of the information, documents, records, facilities or current or former employees that are being withheld, as well as the legal basis for withholding access.  The Fraud Section may then consider whether to make a further request for access to such information, documents, records, facilities, or employees.

*Monitor's Coordination with the*
*Company and Review Methodology*

7.      In carrying out the Mandate, to the extent appropriate under the circumstances, the Monitor should coordinate with Company personnel, including in-house counsel, compliance personnel, and internal auditors, on an ongoing basis.  The Monitor may rely on the product of the Company's processes, such as the results of studies, reviews, sampling and testing methodologies, audits, and analyses conducted by or on behalf of the Company, as well as the Company's internal resources (e.g., legal, compliance, and internal audit), which can assist the Monitor in carrying out the Mandate through increased efficiency and Company-specific expertise, provided that the Monitor has confidence in the quality of those resources.

8.      The Monitor's reviews should use a risk-based approach, and thus, the Monitor is not expected to conduct a comprehensive review of all business lines, all business activities, or all markets.  In carrying out the Mandate, the Monitor should consider, for instance, risks presented by: (a) the countries and industries in which the Company operates; (b) current and

D-3

future business opportunities and transactions; (c) current and potential business partners, including third parties and joint ventures, and the business rationale for such relationships; (d) the Company's gifts, travel, and entertainment interactions with foreign officials; and (e) the Company's involvement with foreign officials, including the amount of foreign government regulation and oversight of the Company, such as licensing and permitting, and the Company's exposure to customs and immigration issues in conducting its business affairs.

9.     In undertaking the reviews to carry out the Mandate, the Monitor shall formulate conclusions based on, among other things:  (a) inspection of relevant documents, including the Company's current anti-corruption policies and procedures; (b) on-site observation of selected systems and procedures of the Company at sample sites, including internal accounting controls, record-keeping, and internal audit procedures; (c) meetings with, and interviews of, relevant current and, where appropriate, former directors, officers, employees, business partners, agents, and other persons at mutually convenient times and places; and (d) analyses, studies, and testing of the Company's compliance program.

*Monitor's Written Work Plans*

10.     To carry out the Mandate, during the Term of the Monitorship, the Monitor shall conduct an initial review and prepare an initial report, followed by at least two follow-up reviews and reports as described in Paragraphs 16-19 below.  With respect to the initial report, after consultation with the Company and the Fraud Section, the Monitor shall prepare the first written work plan within sixty (60) calendar days of being retained and the Company and the Fraud Section shall provide comments within thirty (30) calendar days after receipt of the written work plan, and the Monitor shall make revisions and prepare a final first written work plan within

D-4

fifteen (15) calendar days after receipt of comments from the Fraud Section.  With respect to each follow-up report, after consultation with the Company and the Fraud Section, the Monitor shall prepare a written work plan at least sixty (60) calendar days prior to commencing a review, the Company and the Fraud Section shall provide comments within thirty (30) calendar days after receipt of the written work plan and the Monitor shall make revisions and prepare a final first written work plan within fifteen (15) calendar days after receipt of comments from the Fraud Section.  Any disputes between the Company and the Monitor with respect to any written work plan shall be decided by the Fraud Section in its sole discretion.

11.     All written work plans shall identify with reasonable specificity the activities the Monitor plans to undertake in execution of the Mandate, including a written request for documents.  The Monitor's work plan for the initial review shall include such steps as are reasonably necessary to conduct an effective initial review in accordance with the Mandate, including by developing an understanding, to the extent the Monitor deems appropriate, of the facts and circumstances surrounding any violations that may have occurred before the date of the Agreement.  In developing such understanding the Monitor is to rely to the extent possible on available information and documents provided by the Company.  It is not intended that the Monitor will conduct his or her own inquiry into the historical events that gave rise to the Agreement.

*Initial Review*

12.     The initial review shall commence no later than one hundred twenty (120) calendar days from the date of the engagement of the Monitor (unless otherwise agreed by the Company, the Monitor, and the Fraud Section).  The Monitor shall provide a preliminary

communication within one hundred twenty (120) days of commencing the initial review and issue a written report within one hundred eighty (180) calendar days of commencing the initial review, setting forth the Monitor's assessment and, if necessary, making recommendations reasonably designed to improve the effectiveness of the Company's program for ensuring compliance with the anti-corruption laws.  The Monitor should consult with the Company concerning his or her findings and recommendations on an ongoing basis and should consider the Company's comments and input to the extent the Monitor deems appropriate.  The Monitor may also choose to share a draft of his or her reports with the Company prior to finalizing them.  The Monitor's reports need not recite or describe comprehensively the Company's history or compliance policies, procedures and practices, but rather may focus on those areas with respect to which the Monitor wishes to make recommendations, if any, for improvement or which the Monitor otherwise concludes merit particular attention.  The Monitor shall provide the report to the Board of Directors of the Company and contemporaneously transmit copies to the FCPA Chief, Fraud Section, Criminal Division, U.S. Department of Justice, at 1400 New York Avenue N.W., Washington, D.C. 20005.  After consultation with the Company, the Monitor may extend the time period for issuance of the initial report for a brief period of time with prior written approval of the Fraud Section.

13.     Within one hundred eighty (180) calendar days after receiving the Monitor's initial report, the Company shall adopt and implement all recommendations in the report, unless, within thirty (30) calendar days of receiving the report, the Company notifies in writing the Monitor and the Fraud Section of any recommendations that the Company considers unduly burdensome, inconsistent with applicable law or regulation, impractical, excessively expensive,

or otherwise inadvisable.  With respect to any such recommendation, the Company need not adopt that recommendation within the one hundred and eighty (180) days of receiving the report but shall propose in writing to the Monitor and the Fraud Section an alternative policy, procedure or system designed to achieve the same objective or purpose.  As to any recommendation on which the Company and the Monitor do not agree, such parties shall attempt in good faith to reach an agreement within forty-five (45) calendar days after the Company serves the written notice.

14.    In the event the Company and the Monitor are unable to agree on an acceptable alternative proposal, the Company shall promptly consult with the Fraud Section.  The Fraud Section may consider the Monitor's recommendation and the Company's reasons for not adopting the recommendation in determining whether the Company has fully complied with its obligations under the Agreement.  Pending such determination, the Company shall not be required to implement any contested recommendation(s).

15.    With respect to any recommendation that the Monitor determines cannot reasonably be implemented within one hundred and eighty (180) calendar days after receiving the report, the Monitor may extend the time period for implementation with prior written approval of the Fraud Section.

*Follow-Up Reviews*

16.    A follow-up review shall commence no later than one hundred-eighty (180) calendar days after the issuance of the initial report (unless otherwise agreed by the Company, the Monitor and the Fraud Section).  The Monitor shall issue a written follow-up report within one hundred-twenty (120) calendar days of commencing the follow-up review, setting forth the

D-7

Monitor's assessment and, if necessary, making recommendations in the same fashion as set forth in Paragraph 12 with respect to the initial review.  After consultation with the Company, the Monitor may extend the time period for issuance of the follow-up report for a brief period of time with prior written approval of the Fraud Section.

17.     Within one hundred twenty (120) calendar days after receiving the Monitor's follow-up report, the Company shall adopt and implement all recommendations in the report, unless, within thirty (30) calendar days after receiving the report, the Company notifies in writing the Monitor and the Fraud Section concerning any recommendations that the Company considers unduly burdensome, inconsistent with applicable law or regulation, impractical, excessively expensive, or otherwise inadvisable.  With respect to any such recommendation, the Company need not adopt that recommendation within the one hundred twenty (120) calendar days of receiving the report but shall propose in writing to the Monitor and the Fraud Section an alternative policy, procedure, or system designed to achieve the same objective or purpose.  As to any recommendation on which the Company and the Monitor do not agree, such parties shall attempt in good faith to reach an agreement within thirty (30) calendar days after the Company serves the written notice.

18.     In the event the Company and the Monitor are unable to agree on an acceptable alternative proposal, the Company shall promptly consult with the Fraud Section.  The Fraud Section may consider the Monitor's recommendation and the Company's reasons for not adopting the recommendation in determining whether the Company has fully complied with its obligations under the Agreement.  Pending such determination, the Company shall not be required to implement any contested recommendation(s).  With respect to any recommendation

D-8

that the Monitor determines cannot reasonably be implemented within one hundred twenty (120) calendar days after receiving the report, the Monitor may extend the time period for implementation with prior written approval of the Fraud Section.

19.     The Monitor shall commence a second follow up review no later than one hundred twenty (120) days after the issuance of the first follow up report (unless otherwise agreed by the Company, the Monitor and the Fraud Section). The Monitor shall issue a written second follow up report within ninety (90) days of commencing the second follow up review, setting forth the Monitor's assessment, and if necessary, making recommendations in the same fashion as set forth in Paragraph 16 with respect to the initial review. Within ninety (90) calendar days after receiving the Monitor's second follow-up report, the Company shall adopt and implement all recommendations in the report, unless, within thirty (30) calendar days after receiving the report, the Company notifies in writing the Monitor and the Fraud Section concerning any recommendations that the company considers impractical or inadvisable for reasons set out in paragraph 17. With respect to such recommendations, the procedures described in Paragraphs 17 and 18 should apply.  No later than seventy-five (75) days before the end of the Term, the Monitor shall certify whether the Company's compliance program, including its policies and procedures, is reasonably designed and implemented to prevent and detect violations of the anti-corruption laws.  Such certification may be supported by a final certification report.

*Monitor's Discovery of Potential or Actual Misconduct*

20.     (a)     Except as set forth below in sub-paragraphs (b) and (c), should the Monitor discover during the course of his or her engagement that:

> • improper payments or anything else of value may have been offered,
> promised, made, or authorized by any entity or person within the
> Company or any entity or person working, directly or indirectly, for or on
> behalf of the Company; or
>
> • the Company may have maintained false books, records or accounts; or

(collectively, "Potential Misconduct"), the Monitor shall immediately report the Potential

Misconduct to the Company's General Counsel, Chief Compliance Officer, and/or Audit

Committee for further action, unless the Potential Misconduct was already so disclosed.  The

Monitor also may report Potential Misconduct to the Fraud Section at any time, and shall report

Potential Misconduct to the Fraud Section when it requests the information.

(b)     If the Monitor believes that any Potential Misconduct actually occurred or

may constitute a criminal or regulatory violation ("Actual Misconduct"), the Monitor shall

immediately report the Actual Misconduct to the Fraud Section.  When the Monitor discovers

Actual Misconduct, the Monitor shall disclose the Actual Misconduct solely to the Fraud

Section, and, in such cases, disclosure of the Actual Misconduct to the General Counsel, Chief

Compliance Officer, and/or the Audit Committee of the Company should occur as the Fraud

Section and the Monitor deem appropriate under the circumstances.

(c)     The Monitor shall address in his or her reports the appropriateness of the

Company's response to disclosed Potential Misconduct or Actual Misconduct, whether

previously disclosed to the Fraud Section or not.  Further, if the Company or any entity or person

working directly or indirectly for or on behalf of the Company withholds information necessary

for the performance of the Monitor's responsibilities and the Monitor believes that such

withholding is without just cause, the Monitor shall also immediately disclose that fact to the Fraud Section and address the Company's failure to disclose the necessary information in his or her reports.

(d)     The Company nor anyone acting on its behalf shall take any action to retaliate against the Monitor for any such disclosures or for any other reason.

*Meetings During Pendency of Monitorship*

21.     The Monitor shall meet with the Fraud Section within thirty (30) calendar days after providing each report to the Fraud Section to discuss the report, to be followed by a meeting between the Fraud Section, the Monitor, and the Company.

22.     At least annually, and more frequently if appropriate, representatives from the Company and the Fraud Section will meet together to discuss the monitorship and any suggestions, comments, or improvements the Company may wish to discuss with or propose to the Fraud Section, including with respect to the scope or costs of the monitorship.

*Contemplated Confidentiality of Monitor's Reports*

23.     The reports will likely include proprietary, financial, confidential, and competitive business information.  Moreover, public disclosure of the reports could discourage cooperation, or impede pending or potential government investigations and thus undermine the objectives of the monitorship.  For these reasons, among others, the reports and the contents thereof are intended to remain and shall remain non-public, except as otherwise agreed to by the parties in writing, or except to the extent that the Fraud Section determines in its sole discretion that disclosure would be in furtherance of the Fraud Section's discharge of its duties and responsibilities or is otherwise required by law.

D-11